64 A.3d 239

SOMA MANDAL, M.D., PLAINTIFF–RESPONDENT/CROSS–APPEL-
LANT, v. PORT AUTHORITY OF NEW YORK AND NEW JER-
SEY AND MODERN FACILITIES SERVICES, DEFENDANTS–
APPELLANTS/CROSS–RESPONDENTS, AND TIMBERLAND
COMPANY, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued October 16, 2012—Decided April 4, 2013.

Before Judges FISHER, WAUGH and ST. JOHN.

*Sean R. Kelly* argued the cause for appellant/cross-respondent Port Authority of New York and New Jersey (*Saiber LLC*, attorneys; *Mr. Kelly*, of counsel; *Mr. Kelly, Michael J. Grohs* and *Christopher J. Turano*, on the brief).

*Benjamin Clarke* argued the cause for appellant/cross-respondent Modern Facilities Services (*DeCotiis, FitzPatrick & Cole*, attorneys; *Mr. Clarke* and *Dawn Attwood*, of counsel; *Mr. Clarke, Ms. Attwood, Jason Attwood* and *Irene Stavrellis*, on the brief).

*Christopher W. Hager* argued the cause for respondent/cross-appellant (*Niedweske Barber Hager,* attorneys; *Kevin E. Barber* and *Mr. Hager,* of counsel and on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

Defendant Port Authority of New York and New Jersey and defendant Modern Facilities Services, Inc., appeal from a judgment based on a jury verdict in favor of plaintiff Soma Mandal, M.D., for injuries suffered as a result of her fall at Pavonia Station in Jersey City on March 18, 2007. Because, among other things, the trial judge erroneously instructed the jury that the Port Authority was burdened by the heightened standard of care imposed on common carriers, we reverse and remand for a new trial.

Plaintiff commenced this action against the Port Authority, Modern Facilities Services and Timberland Company.[1] At the conclusion of a twelve-day trial, the jury reached a verdict for plaintiff, apportioning seventy-five percent of the liability to the Port Authority and twenty-five percent to Modern, and awarding plaintiff $7,231,397, which included $106,397 for past and future household expenses incurred as the result of her injury, $4,125,000 for past and future lost earnings, and $3,000,000 for pain and suffering. Defendants unsuccessfully moved for judgment notwithstanding the verdict, remittitur and a new trial, and judgment was entered in favor of plaintiff in the amount of $7,735,002.24, which included $503,605.24 in prejudgment interest.

The Port Authority and Modern appeal, and plaintiff cross-appeals. Defendants' arguments require our consideration of: (1) whether the Port Authority should have been held to the traditional standard of "utmost caution" for common carriers when plain-

---

[1] Plaintiff later consented to a dismissal of her claims against Timberland. The remaining defendants successfully moved for a dismissal of plaintiff's claim for punitive damages.

tiff's fall occurred in a station and not while getting on or off or riding on a train, and the consequences of that determination; (2) whether plaintiff should have been permitted to read portions of a deposition of a witness who resided in Texas regarding the circumstances of his fall in Pavonia Station eighteen hours earlier than plaintiff's fall; (3) whether the judge erred in permitting plaintiff's treating physician to provide an opinion about permanency and whether the judge also erred in limiting cross-examination of that witness; (4) whether the judge erred in instructing the jury that it could draw an adverse inference from the failures of the Port Authority and Modern to provide records or videotapes; (5) whether the Port Authority may be compelled to pay prejudgment interest; and (6) whether plaintiff's counsel made improper statements during his summation.[2]

We find plaintiff's cross-appeal—in which she argues that *N.J.R.E.* 407 evidence of defendants' post-accident actions should have been permitted, that her attorney should have been permitted to cross-examine an investigator about who had retained him, apparently for the sole purpose of revealing that the investigator was hired by an insurance company, and that her claim of punitive damages should not have been dismissed—to have insufficient merit to warrant discussion in a written opinion. *R.* 2:11–3(e)(1)(E). We, thus, turn to the issues presented by defendants.
[At the request of the Appellate Division, only the sections of this opinion that dealt with the Port Authority's standard of care (Section I) and the availability of prejudgment interest (Section V) are to be published.]

I

The Port Authority first argues the trial judge erred in finding—and instructing the jury—that the Port Authority was a "common carrier" and owed those who used Pavonia Station a greater duty of care than other land occupiers. We agree that the

---

[2] Defendants have also argued that the trial judge should have ordered remittitur in light of the high damage award. In light of our disposition of the appeal, we need not reach this issue.

utilization of the common-carrier standard of care was erroneous in these circumstances.

The trains that service Pavonia Station are operated by the Port Authority Trans–Hudson (PATH) rail system, a corporation wholly-owned and operated by the Port Authority. Pavonia Station is also owned and operated by the Port Authority, which contracted with Modern to provide cleaning services at the station. The evidence adduced at trial revealed that, at or around 7:00 a.m. on Sunday, March 18, 2007, plaintiff entered Pavonia Station and began walking down its North Corridor to board a train bound for New York City. Plaintiff, a physician, was commuting to New York University's Medical Center, where she was scheduled to begin work ninety minutes later. She only saw one other passenger walking in the North Corridor.

The North Corridor is a sloping ramp that leads downward to the boarding platforms. Its floor is tiled, and handrails are affixed to the walls. In wet conditions, Modern placed black mats [3] over the part of the floor beneath the handrails. When plaintiff entered the corridor, mats were situated under the handrail, although the snow and rain had ended the day before.

In traversing the North Corridor, plaintiff walked on the mats. She did not observe any signs warning of a slippery condition, and she did not use the handrail. Roughly "halfway down" the corridor, plaintiff's right foot slipped "on the mat," and she fell. She could not recall on which part of her body she had fallen, but remembered "lying face down ... against the tiles." And, although she did not know what caused the fall, plaintiff recalled having "walked on a slippery mat."

There is no doubt that plaintiff's fall did not occur while she was boarding a train or even while on the platform waiting to board a train. Plaintiff fell in an underground corridor on her way to the train platform. As a result, the judge erred in holding the Port

---

[3] These mats have grooves facing upward and are approximately twenty-four to thirty inches wide.

Authority to the common-carrier standard. That is, the Port Authority owed plaintiff a standard of care commensurate with the nature of the occurrence. If plaintiff was injured while riding a train or while embarking or disembarking from a train, the common-carrier standard of care might arguably apply. But, as here, when patrons are in a train station on their way to or from a platform, the Port Authority's role is that of an occupier of land and the less onerous standard of care applicable to that undertaking governed the Port Authority's liability here.

For example, in *Lieberman v. Port Authority of New York & New Jersey*, 132 *N.J.* 76, 85, 622 *A.*2d 1295 (1993), the Court considered whether a complaint stated legally cognizable causes of action against the Port Authority where plaintiff alleged she was assaulted and robbed by a homeless man as she exited a bakery located in the Port Authority Bus Terminal in New York City. *Id.* at 79–80, 622 *A.*2d 1295. Although the Court determined that the plaintiff could not sue the Port Authority for failing to provide police protection at the bus terminal, it construed the complaint as stating a cause of action for injuries caused by foreseeable acts of third persons in the Port Authority's capacity as a landlord required to provide reasonably safe premises for invitees. *Id.* at 90–91, 93, 622 *A.*2d 1295. In accord with past precedent, the Court did not impose the greater duty reserved for common carriers in that instance. *See Buchner v. Erie R.R. Co.*, 17 *N.J.* 283, 285–86, 111 *A.*2d 257 (1955) (holding the defendant-railroad to the duty of a proprietor of premises once plaintiff had debarked from defendant's train when he tripped while walking through a darkened area a few feet away from the train station's property line); *Bohn v. Hudson & Manhattan R.R. Co.*, 16 *N.J.* 180, 189–90, 108 *A.*2d 5 (1954) (imposing only the duty owed by an occupier of land when the defendant-railroad's patron slipped and fell on stairs in its train station); *Seckler v. Pennsylvania R.R. Co.*, 113 *N.J.L.* 299, 300–01, 174 *A.* 501 (E. & A.1934) (observing the "distinction, long recognized by the courts of this state, between the degree of care required of a common carrier, with respect to the safe carriage of its passengers, and that required in the

construction and maintenance of its station and the approaches thereto"); *Karmazin v. Pennsylvania R.R. Co.*, 82 *N.J.Super.* 123, 130–31, 196 *A.*2d 803 (App.Div.1964) (holding the defendant-railroad to the common carrier's enhanced duty of care because the plaintiff-passenger slipped and fell on ice on a station platform while disembarking from a railcar); *Monaco v. Harran's Transp. Co.*, 220 *A.D.*2d 564, 632 *N.Y.S.*2d 814, 814 (1995) (stating that "[i]t is well settled under New Jersey law that a duty of ordinary care is imposed on a common carrier with regard to sidewalks, streets, loading platforms, or other places of ingress and egress to and from the carrier").

▮ In short, the Port Authority's duty to a patron extends throughout the station and, indeed, even beyond its perimeter, *see Buchner, supra,* 17 *N.J.* at 285–86, 111 *A.*2d 257, but any change in *the level of care* depends on the location of the incident. Accordingly, while on board a train, or while embarking or debarking, the high degree of care owed by a common carrier might apply, but the lesser standard applicable to occupiers of land otherwise applies. Because plaintiff was injured while walking through a corridor and not while riding in or embarking or debarking from a train, the trial judge erred when he instructed the jury that the Port Authority owed plaintiff the duty to "use the utmost caution to protect their passengers" once plaintiff entered Pavonia Station.[4]

Plaintiff argues that, even if incorrect, this jury instruction was not capable of producing an unjust result because "the jury[ ] [determined] the Port Authority was 75% responsible for causing

---

[4] This duty has been described "as one of 'the highest degree of vigilance, care and precaution.'" *Davis v. Devereux Found.,* 209 *N.J.* 269, 299, 37 *A.*3d 469 (2012) (quoting W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 34 at 209 (5th ed. 1984)). There is no doubt that the judge instructed plaintiff was owed this standard of "utmost caution" because he advised the jury that "Dr. Mandal became a passenger when she entered the station ground of [Pavonia] [S]tation with the intention of becoming a passenger, and from that point was entitled to the care owed by a carrier to a passenger."

[p]laintiff's personal injuries." We disagree. Where there is a heightened standard of care, as opposed to a heightened standard of proof, the application of the lower standard does not mean the jury would have reached the same conclusion. The fact that the jury found the Port Authority liable and largely responsible for the damages does not suggest it would have reached the same verdict if it had been told to apply a less rigorous standard of care and had it not been misinformed that the Port Authority owed plaintiff "the utmost caution."

■ The trial judge's instructions must also be considered from the standpoint of New York law. The Port Authority was created in 1921 by a compact signed by New York and New Jersey, and is a joint and common agency of both states. *Lieberman, supra*, 132 *N.J.* at 82, 622 *A*.2d 1295. "The Port Authority is not the agency of a single state but rather a public corporate instrumentality of New Jersey and New York." *Bunk v. Port Auth.*, 144 *N.J.* 176, 184, 676 *A*.2d 118 (1996). As a result, "neither creator state may unilaterally impose additional duties, powers, or responsibility upon the Authority," and "principles of parallelism" control the disposition of issues affecting the Port Authority. *Id.* at 184–85, 676 *A*.2d 118. As a result, New York law is "influential precedent because of the bi-state nature of the Port Authority." *Lieberman, supra*, 132 *N.J.* at 84, 622 *A*.2d 1295.

Interestingly, in *Bethel v. New York City Transit Authority*, 92 *N.Y.*2d 348, 681 *N.Y.S.*2d 201, 703 *N.E.*2d 1214, 1218 (1998), New York's highest court "abandoned the rule that common carriers owe a 'duty of highest care,' and decided to 'realign the standard of care required of common carriers with the traditional, basic negligence standard of reasonable care under the circumstances.'" *Boyd v. Manhattan & Bronx Surface Transit Operating Auth.*, 9 *N.Y.*3d 89, 845 *N.Y.S.*2d 781, 876 *N.E.*2d 1197, 1199 (2007). The Court reasoned that the historical justifications for imposing a high duty of care on common carriers had no modern relevance, as the "primitive safety features" that caused substantial railroad accident injuries no longer exist. *Bethel, supra*, 681 *N.Y.S.*2d 201,

703 *N.E.*2d at 1216. Here, we need not consider what standard would apply if the injury occurred on a train, a circumstance that would create a conflict between New Jersey and New York law, since only the former would presently impose the heightened standard of care on the Port Authority. We merely observe that New Jersey and New York law are in accord with the standard of care to be applied to the Port Authority when an injury occurs while the plaintiff is neither riding on, nor getting on or off, a train. Before *Bethel* and since the nineteenth century, New York had applied "[a] lesser [than the common-carrier] standard of care ... with respect to approaches, station platforms, halls and stairways, under which the carrier is held 'to exercise ordinary care, in view of the dangers attending its use, to make it reasonably adequate for the purpose to which it was devoted.'" *Lewis v. Metro. Transp. Auth.*, 99 *A.D.*2d 246, 472 *N.Y.S.*2d 368, 370 (quoting *Lafflin v. Buffalo & Southwestern R.R. Co.*, 106 *N.Y.* 136, 12 *N.E.* 599, 600–01 (1887)), *aff'd o.b.*, 64 *N.Y.*2d 670, 485 *N.Y.S.*2d 252, 474 *N.E.*2d 612 (1984). As a result, both New Jersey and New York are in accord as to the standard of care to be imposed on the Port Authority with regard to its walkways. The trial judge erred in imposing a common-carrier standard of care on the Port Authority that was contrary to both New Jersey and New York law.

As a general matter, we will not reverse if an erroneous jury instruction was "incapable of producing an unjust result or prejudicing substantial rights." *Fisch v. Bellshot*, 135 *N.J.* 374, 392, 640 *A.*2d 801 (1994). In considering this question, we examine the charge as a whole, giving due consideration to surrounding language to determine its true effect. *Viscik v. Fowler Equip. Co.*, 173 *N.J.* 1, 18, 800 *A.*2d 826 (2002). Here, it is true that the trial judge informed the jury that common carriers have a duty of "reasonable care in the maintenance of station buildings ... so that they are reasonably safe for passengers to use them," but that statement was preceded by the "utmost care" language quoted earlier and followed, as well, by the judge's statement to

the jury that the Port Authority was held to a different standard than Modern. Indeed, the judge specifically told the jury that, in cases involving a "slippery condition" from the effect of weather, the Port Authority must be held to a "high degree of care." This erroneous instruction struck at the heart of the matter and was clearly capable of producing an unjust result.

This error not only requires a new trial as to the liability of the Port Authority but of Modern as well, even though the instructions regarding Modern's standard of care were accurate, because the liability of the Port Authority and Modern cannot be apprised separately. *See, e.g., Conklin v. Hannoch Weisman,* 145 *N.J.* 395, 410, 678 *A.*2d 1060 (1996). The jury was required to allocate each defendant's degree of responsibility for plaintiff's injuries. Here, if the jury had been charged that the Port Authority had the same duty of care as Modern, instead of the higher duty, then it might have allocated liability to reflect those equivalent duties. Instead, the Port Authority, which the jury was told had a higher duty, was found to be the most negligent. Consequently, the jury may have found that the Port Authority was more culpable simply because, in light of the charge, it was saddled with a duty to protect plaintiff from foreseeable injury to a greater extent than Modern. Under the higher duty, the proximate cause effects of the Port Authority's negligence may have been superior in the jury's mind. Therefore, we conclude the charge was prejudicial and a retrial on liability and the allocation of liability is necessary to remedy the error. *See Mavrikidis v. Petullo,* 153 *N.J.* 117, 148, 707 *A.*2d 977 (1998) (remanding for "reallocation trial" to determine appropriate percentage of fault as between the defendants); *Riley v. Keenan,* 406 *N.J.Super.* 281, 301, 967 *A.*2d 868 (App.Div.) (vacating judgment against one defendant and remanding "for retrial of liability allocation as between the remaining defendants"), *certif. denied,* 200 *N.J.* 207, 976 *A.*2d 384 (2009).

A more difficult question concerns whether, as in *DeRobertis v. Randazzo,* 94 *N.J.* 144, 160, 462 *A.*2d 1260 (1983), "the erroneous jury instruction on liability contaminated the entire verdict and

that a new trial is necessary on both liability and damages." In light of other errors, as well as the exceedingly high verdict, we would have no confidence in concluding that the damages award was not impacted by the erroneous standard of care charged by the judge. Accordingly, we reverse and remand for a new trial on all issues.

## V

■ The Port Authority argues that the trial judge erred by assessing prejudgment interest, claiming it is exempt from such an award because it is a public entity. Although our conclusion that a new trial is warranted does not necessitate our disposition of this issue, we provide the following for guidance should plaintiff again obtain a verdict in her favor.

We start with *Rule* 4:42–11(b), which permits an award of prejudgment interest "except where provided by statute with respect to a public entity or employee," and with *N.J.S.A.* 59:9–2(a), which declares that "[n]o interest shall accrue prior to the entry of judgment against a public entity or public employee." The Port Authority claims it is a public entity within the intendment of *N.J.S.A.* 59:9–2(a) and, thus, plaintiff was not entitled to prejudgment interest.

■ That argument is an over-simplification of the issue. The Port Authority is not just any public entity. As our Supreme Court has recognized, "[a]lthough the Port Authority serves a governmental function, it is not immune from suit," *Lieberman, supra,* 132 *N.J.* at 82, 622 *A.*2d 1295, and, in fact, in forming the Port Authority, New Jersey and New York consented to "liability ... in such suits, actions or proceedings for tortious acts committed by [the Port Authority] and its agents to the same extent as though it were a private corporation," *N.J.S.A.* 32:1–162; *N.Y. Unconsol. Laws* § 7106. In light of this waiver of immunity, the Port Authority does not contend that the substantive provisions of the Tort Claims Act apply, but urges that we find, in light of *Dorn v. Transport of New Jersey,* 200 *N.J.Super.* 159, 491 *A.*2d 1

(App.Div.1984), that, in spite of *Lieberman*, other provisions of the Tort Claims Act, specifically *N.J.S.A.* 59:9–2(a), should in fairness apply.

In *Dorn*, we held that applying *N.J.S.A.* 59:9–2(a) to the Transport of New Jersey, when no other provisions of the Tort Claims Act applied, was not inconsistent with the policy of the Tort Claims Act of limiting the liability of a public entity strictly to its negligence. *Id.* at 162, 164, 491 *A.*2d 1. *Dorn*, however, is distinguishable. The Transport of New Jersey was a "public entity" because it was owned by the New Jersey Transit Corporation, which, according to its implementing legislation, was a State "instrumentality" deemed to be performing an "essential governmental function" in the exercise of its statutory authority. *Id.* at 162, 491 *A.*2d 1 (quoting *N.J.S.A.* 27:25–4). This fit squarely within the definition of a "public entity" in the Tort Claims Act. *Ibid.* (citing *N.J.S.A.* 59:1–3).

To be sure, the Port Authority also performs essential governmental functions. *Lieberman, supra,* 132 *N.J.* at 82, 622 *A.*2d 1295. But, unlike the New Jersey Transit Corporation, the Port Authority is a "public corporate instrumentality of New Jersey and New York." *Bunk, supra,* 144 *N.J.* at 184, 676 *A.*2d 118. Although courts have acknowledged that the Port Authority is a "public agency" of both states, its bi-state nature removes it from the notice provisions of the Tort Claims Act. *Lieberman, supra,* 132 *N.J.* at 82, 622 *A.*2d 1295; *Williams v. Nat'l Car Rental Sys., Inc.,* 225 *N.J.Super.* 164, 168, 541 *A.*2d 1125 (Law Div.1988); *see also Foster v. Newark Housing Auth.,* 389 *N.J.Super.* 60, 65, 911 *A.*2d 82 (App.Div.2006).

Although the precise issue has not previously been decided, we conclude that the Port Authority's claim of immunity from prejudgment interest must fail. In *Bell v. Bell,* 83 *N.J.* 417, 423–24, 416 *A.*2d 829 (1980), the Court considered the application of the notice provisions of the Tort Claims Act to another bi-state agency, the Delaware River Port Authority (DRPA). In that regard, the Court recognized that even though the DRPA could

arguably fall within the definition of "public entity" set forth in the Tort Claims Act, "it is clear that the act itself cannot apply" because DRPA is a bi-state agency "that derives its powers, including the power to sue and be sued" from joint legislative action and, thus, is beyond the power of the New Jersey Legislature to modify. *Ibid.* The Court thus concluded that the DRPA is not a public entity "within the meaning and scope of [the Tort Claims Act] so that *none of its provisions* apply to DRPA." *Id.* at 425, 416 *A.*2d 829 (emphasis added). *See also Ballinger v. Del. River Port Auth.,* 172 *N.J.* 586, 593–94, 800 *A.*2d 97 (2002). Consequently, we reject the argument that certain portions of the Tort Claims Act apply and instead adhere to the Court's clear holding in *Bell* that no provision of the Tort Claims Act applies to the Port Authority.

Like the DRPA, the Port Authority was created—with the consent of Congress—by a compact between New Jersey and another state, here New York. There is no principled reason for applying some portion of the Tort Claims Act for the benefit of the Port Authority when our Supreme Court, in *Bell,* has refused to do so with regard to the DRPA. The compact that created the Port Authority allows it to sue and be sued to the same extent as though it were a private corporation and may, for the same reason, be held liable for an award of prejudgment interest.

Reversed and remanded for a new trial.