**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2356-17T1

PARSIPPANY-TROY HILLS
POLICE CAPTAIN JAMES CARIFI,

    Plaintiff-Appellant,

v.

TOWNSHIP OF PARSIPPANY-
TROY HILLS, GOVERNING BODY
OF THE TOWNSHIP OF
PARSIPPANY-TROY HILLS, AND
FORMER POLICE CHIEF MICHAEL
PECKERMAN,

    Defendants-Respondents.

_____

        Argued February 12, 2020 – Decided December 14, 2020

        Before Judges Hoffman and Currier.

        On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-2938-11.

        Christopher L. Deininger argued the cause for appellant (Deininger & Associates, LLP, attorneys; Christopher L. Deininger, on the briefs).

Thomas B. Hanrahan argued the cause for respondents (Hanrahan, Pack, LLC, attorneys; Thomas B. Hanrahan, Kathy A. Kennedy, and Andy G. Mercado, on the brief).

The opinion of the court was delivered by

HOFFMAN, J.A.D.

On October 24, 2011, plaintiff James Carifi, then a captain in the Parsippany-Troy Hills Police Department (the PD), filed a complaint in the Law Division asserting various causes of action related to his employment. By the time of trial, only plaintiff's whistleblower claim remained, alleging defendants violated the Conscientious Employee Protection Act (CEPA).[1] Although the jury found that plaintiff acted in good faith by reporting several activities to superiors between 2009 and 2011, and that he had an "objectively reasonable belief" the activities involved an actual or potential violation of law or public policy, the jury found that plaintiff did not prove that defendants retaliated against him for making these reports. As a result, the trial judge entered a judgment of no cause in favor of defendants and dismissed plaintiff's complaint.

Plaintiff now appeals from the no cause jury verdict and the order denying his motion for a new trial. Plaintiff contends the trial judge committed multiple

---

[1] N.J.S.A. 34:19-1 to -14.

A-2356-17T1

trial errors, including providing an improper response to a critical question submitted by the jury during deliberations. Plaintiff also challenges seventeen other trial court rulings. For the reasons that follow, we reverse and remand for a new trial.

## I.

We begin by summarizing the most pertinent trial evidence. As noted, when plaintiff filed suit in 2011,[2] he was a captain in the PD. His complaint named two defendants, the Township of Parsippany-Troy Hills (the Township) and the PD's former chief of police, Michael Peckerman, who retired in August 2011. In January 2009, when he held the rank of lieutenant, plaintiff was assigned to the PD's Planning and Research Section of the Support Services

---

[2] This action (Carifi I) was the first of three lawsuits involving plaintiff and the Township. In Carifi II, filed in October 2013, the Township sued plaintiff for breach of contract, Township of Parsippany-Troy Hills v. Carifi, No. MRS-L-2604-13; in that suit, the Township alleged plaintiff wrongfully refused to repay the tuition for his graduate degree, after he did not remain employed as an officer for two years after receiving his degree. Carifi II settled before trial. On December 26, 2014, plaintiff filed suit in Carifi v. Barberio, Inglesino, et al., MRS-L-3140-14 (Carifi III); in that action, plaintiff alleged tortious conduct against the Township, and four other defendants. On August 28, 2017, the Law Division granted dismissal motions filed by each defendant, after determining plaintiff's complaint failed to state a claim upon which relief could be granted. Plaintiff then appealed the dismissal of Carifi III (A-0597-17); in a separate opinion issued simultaneously with this opinion, we affirm the dismissal of Carifi III.

A-2356-17T1

Division.  In May 2009, Captain Edward Jasiecki became plaintiff's superior.

The record indicates that the upper level of the chain of command within the PD

consists of the chief, deputy chief, and then four captains beneath them.

On September 2, 2009, Captain Jasiecki lodged an Internal Affairs (IA)[3]

complaint against plaintiff, alleging criminal official misconduct, under

N.J.S.A. 2C:30-2.[4]  According to the complaint, plaintiff violated the PD's

---

[3] When asked about his first involvement in the IA process after joining the Parsippany PD in 1992, plaintiff recounted, "I was a witness against fellow officers who had assaulted a juvenile and I testified truthfully against them."

[4] N.J.S.A. 2C:30-2 provides:

> A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:
>
> a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner; or
>
> b. He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.
>
> Official misconduct is a crime of the second degree.  If the benefit obtained or sought to be obtained, or of which another is deprived or sought to be deprived, is of a value of $200.00 or less, the offense of official misconduct is a crime of the third degree.

A-2356-17T1

"Rules & Regulation/Policy & Procedure," which involved allegations of a "road job policy violation"[5] by improperly adjusting the schedule of two subordinates, Sergeant Yvonne Christiano and Patrolman Earl Kinsey. This complaint resulted in an investigation, designated IA 09-32.

Upon receipt of the complaint, Chief Peckerman and Captain Jasiecki transferred plaintiff to the Records Section of the Support Services Division,[6] telling plaintiff they did not want him to remain in charge of Sergeant Christiano and Patrolman Kinsey during the investigation of IA 09-32.[7] Plaintiff's job duties were also reduced. In addition, the PD referred IA 09-32 to the Morris County Prosecutor's Office (MCPO) for a criminal review. In a letter dated October 5, 2009, the MCPO returned the complaint to the PD "for the commencement of an administrative investigation." The letter further advised that "this Office will close its file and take no further action."

On September 8, 2009, during the time of his reassignment to the Records Section, plaintiff reviewed paperwork generated by the Township's Animal

---

[5] Plaintiff described a "road job" as an off-duty job performed for a contractor.

[6] The transfer did not require plaintiff to move to a different office.

[7] Notwithstanding the fact that Captain Jasiecki signed the IA complaint against plaintiff, he remained plaintiff's supervisor.

A-2356-17T1

Control Division, including its overtime sheets. During this review, plaintiff noted that certain animal control employees appeared to engage in "double dipping," by seeking compensation twice for the same hours, through compensatory time and overtime. Plaintiff further noted that some paperwork included entries for time worked through September 12, 2009, even though it was only September 8, 2009. As a result, plaintiff contacted the Animal Control Division and spoke to its supervisor, who explained that submitting timesheets to receive both compensatory time and overtime – and submitting time in advance – resulted from an "agreement" put in place by previous supervisors.

Following this exchange, plaintiff sent a memo to Chief Peckerman and Captain Jasiecki on September 9, 2009, attaching the timesheets as evidence of "this apparent ongoing practice" of double dipping. Plaintiff expressed "serious concerns" with the supervisor's explanation for these payroll practices and noted that, in the past, the PD "had considered [such practices] an act of 'Official Misconduct' and conducted an [IA] investigation." Plaintiff's memo also noted that submitting time sheets in advance could become "a problem, should an employee get injured, be sick, be late, use a vacation day, etc." Plaintiff hand-delivered this memo to Captain Jasiecki's office.

A-2356-17T1

On January 19, 2010, then-Captain Paul Philipps completed the investigation of IA 09-32, culminating in a finding of "not sustained." As a result, plaintiff returned to his previous position in the Research and Planning Division, but not until April 2010. According to plaintiff, then-Captain Philipps, deliberately "dragged his feet" in completing the probe and delayed informing him that the MCPO concluded the incident was not a criminal offense. At trial, then-Chief Philipps disputed plaintiff's claim, testifying that he was busy with multiple internal affairs investigations and had difficulty arranging all the necessary interviews.

Plaintiff recounted that he felt humiliated and embarrassed as a result of his initial transfer to the Records Section. He also said he used approximately thirty vacation days during the time of his transfer, "specifically to be away from the [PD] just to deal with the stress" involved with the investigation of IA 09-32. Plaintiff further testified he was scheduled to attend grant-writing training in October 2009, but was denied that opportunity.

In December 2009, plaintiff filed an IA complaint against Captain Jasiecki, logged as IA 09-48, alleging a violation of PD rules and regulations. Plaintiff filed this complaint after he found a document that contained disparaging information about him, including a claim that he was about to

7

receive a promotion because of "his hard work" in a political campaign. Plaintiff found the document – essentially an anonymous press release – in a PD copy machine, after it had been faxed to various news outlets. The document urged the outlets to "look into the following information from the Parsippany [PD]."

It was quickly determined that Captain Jasiecki prepared the document, which began with a discussion of a "recently conducted audit of the Parsippany [PD]," even though the "report has not been made public." Captain Jasiecki wrote that the audit "shows that the Parsippany [PD] is a top heavy organization . . . . [that] does not need any additional Captains[.]" He then made the following remarks concerning plaintiff:

> Newly elected Mayor James Barberio had been promising several police officers that they would be receiving political favors in the form of promotion for them assisting him in his campaign. One officer in particular, Lieutenant James Carifi, has been walking around the police department telling everyone that the new mayor promised to promote him to Captain during the first two weeks of him taking office. Lieutenant Carifi stated that Barberio told him that he would be promoted due to his hard work -- due to the hard work he put in in hanging campaign signs and doing door-to-door for him. This stinks.

Following an IA investigation, on January 5, 2010, the charges against Captain Jasiecki were sustained, with a resulting ten-day suspension without pay; however, plaintiff testified that Captain Jasiecki never served this

suspension,[8] nor was he ever transferred before, during, or after the investigation.

On May 26, 2010, plaintiff sent a memo to Captain Michael Kennedy, his division supervisor, notifying him of an issue with Sergeant Thomas Carney's payment request for Patrolman Kinsey's attendance at a class. Plaintiff asserted that Patrolman Kinsey did not follow the chain of command in making his request; in addition, he sought compensatory time for a day he normally worked, while also being out on family leave.

On July 19, 2010, IA commenced investigation of a new case, logged as IA 10-15, following a complaint lodged against plaintiff by Sergeant Christiano and Patrolman Kinsey; in their complaint, they alleged that plaintiff harassed and retaliated against them for acting as witnesses against plaintiff in the investigation of IA 09-32. During the investigation of IA 10-15, plaintiff was again transferred to the Records Section; in addition, this time he was ordered to relocate to a different office during the pendency of the investigation.

---

[8] Captain Jasiecki disputed the claim that he never served his suspension, testifying that Chief Peckerman agreed that he could serve his suspension one day at a time, which he spread out over "[ten] pay periods."

A-2356-17T1

Before the investigation of IA 10-15 began, plaintiff had been scheduled to work an event, National Night Out,[9] in August 2010, with Patrolman Kinsey. This changed, however, when Captain Kennedy removed plaintiff from the schedule, thus depriving him of overtime pay for working this event. Plaintiff testified he again took time off during the investigation of IA 10-15 to deal with stress.

On August 31, 2010, the investigation of IA 10-15 concluded in a disposition of "not sustained and exonerated." On August 1, 2010, Captain Kennedy retired and, as the next highest-ranking officer in the division, plaintiff assumed command as acting captain. After thirty days in this position, plaintiff testified he should have received captain's pay, pursuant to his employment contract. When this did not occur, plaintiff raised the issue with Chief Peckerman, and then "eventually" received acting captain's pay.

As a division commander, plaintiff also expected to have access to the division commander's vehicle that he could take home, the same as the other division commanders. On September 13, 2010, plaintiff sent Chief Peckerman an e-mail, asking if he had access to a vehicle and received a one-word response,

---

[9]   During National Night Out, various organizations and law enforcement agencies jointly hold an event that allows citizens to learn about their services.

"No," without further explanation. This issue resolved in October 2010, when plaintiff began receiving the same vehicle access as other division commanders.

On January 4, 2011, plaintiff served a notice of tort claim upon the Township, pursuant to the New Jersey Tort Claims Act.[10] In the notice, plaintiff alleged, "Captain Jasiecki has a pattern of making false allegations against me." Plaintiff provided a list of these "false allegations" in six single-spaced, typewritten pages.

The following month, at a staff meeting on February 3, 2011, plaintiff informed Deputy Chief Anthony DeZenzo, Captain Philipps, and Chief Peckerman's secretary that thirteen of the department's forty-three laptops "were missing," without explanation. Plaintiff expressed concern the missing laptops had been stolen. Notwithstanding his report of this problem, plaintiff testified he never learned of any follow-up investigation regarding the thirteen missing laptops nor did anyone ever contact him about the matter.

On May 25, 2011, an anonymous caller, who identified himself as "Kevin," lodged an IA complaint against plaintiff, accusing him of

---

[10] N.J.S.A. 59:1-1 to 12-3.

"campaigning for his brother"[11] while in uniform and on-duty. This complaint was logged as IA 2011-09, which proceeded as an administrative investigation.

Then-Lt. Andrew Miller[12] received this initial report from Kevin and completed the subsequent investigation. Kevin made various allegations against plaintiff, including personally witnessing plaintiff, while in uniform and on-duty, asking movie theater employees if they were registered to vote and stating that they should vote for his brother in the upcoming council election. Kevin also alleged that plaintiff "is using his position as the PD's Citizen Police Academy (the CPA)[13] coordinator to call former attendees . . . to encourage them to vote for his brother and/or provide them with absentee ballots" that he would complete on their behalf. Additionally, "Kevin" accused plaintiff of improperly

---

[11] At the time, Paul Carifi, Jr., plaintiff's brother, was running for Parsippany Council.

[12] By the time of his trial testimony in September 2017, Andrew Miller held the rank of captain and was the commander of the PD's Investigative Division, which included the IA Section, a position he held the previous two and a half years. In 2007, he was first assigned to the Investigative Division, where he began conducting confidential investigations, as a detective sergeant. He was promoted to lieutenant in 2011 and captain in 2013.

[13] The PD's website previously described the CPA as a free ten-week program that provides "an in-depth view into various areas of law enforcement such as criminal investigations, firearms, use of force, officer safety, motor vehicle stops, and advancement in technology utilized in law enforcement today." http://www.parpolice.com/ (visited on May 28, 2019).

A-2356-17T1

using his PD computer to obtain resident contact information and of "strong-arming" some local business owners to remove campaign signs of his brother's opponents and replace them with his brother's signs.

On August 2, 2011, then-Lt. Miller completed the IA investigation of Case # 2011-09, with a recommended disposition that the allegations of "conducting political activity on-duty/personal use of department property" were "unfounded." Chief Peckerman accepted the recommendation and entered an "unfounded" disposition the same day.

On July 1, 2011, plaintiff wrote a memo advising Deputy Chief DeZenzo that he "strongly disagree[d]" that an applicant for a school crossing guard position should be hired, in light of a previous larceny conviction. Plaintiff personally discussed his concerns with Deputy Chief DeZenzo, who told plaintiff to "leave it alone." Plaintiff testified that he later found out that the applicant was related to the Township's council president. That applicant was eventually hired as a crossing guard.

On June 5, 2012, plaintiff wrote a memo to then-Chief DeZenzo and delivered it to his secretary, asking the Township to request the scheduling of a civil service examination for the deputy chief position. Plaintiff's memo explained that the Township needed to request the examination prior to July 1,

13

2012, in order to hold the test that year. In a follow-up e-mail to then-Deputy Chief Philipps on July 17, 2012, plaintiff asked if the Township called for a deputy chief exam, pursuant to his request. Then-Deputy Chief Philipps responded, stating "this is the first time I have seen [your request] . . . but I will look into it." One week later, he sent plaintiff an email advising that a deputy chief's examination had not been requested.

At that point, plaintiff went to Chief DeZenzo's office and requested a copy of the memo he submitted on June 5, 2012. The Chief's secretary provided plaintiff a copy of his memo, which contained the initials of then-Deputy Chief Philipps next to a date of June 7, 2012. Upon seeing this, plaintiff testified, "I was angry," since the initials of then-Deputy Chief Philipps on plaintiff's memo directly contradicted his claim that he first saw plaintiff's request on July 17, 2012. Plaintiff testified that the Township's failure to call for a deputy chief exam denied him "[t]he right to be promoted to deputy chief."

At trial, plaintiff contended he engaged in the following protected acts: sending the memo questioning Animal Control's payroll practices; sending the memo identifying concerns about Ptlm. Kinsey's payment requests while on family leave; reporting the missing laptop computers; filing the notice of tort claim; and sending the memo regarding the record of the crossing guard.

14

Plaintiff asserted the Township retaliated against him for these protected acts, with the following actions: delayed investigation of IA 09-32; transferred plaintiff without job duties; delayed returning plaintiff to his prior position after the investigation of IA 09-32 was not sustained; removed plaintiff from the grant-writing training program; commenced investigation of IA Case 10-15 against plaintiff and again transferring him; removed plaintiff from the National Night Out work detail; delayed providing plaintiff with a division commander's vehicle; and failed to timely call for a deputy chief's civil service examination. Plaintiff also claimed he received disparate treatment, citing the non-transfer of Captain Jasiecki during the investigation of IA 09-48, and after it was sustained, as further evidence of retaliation.

During deliberations, the jury forwarded a question to the trial judge concerning question three on the verdict sheet, which asked, "Do you find that [p]laintiff James Carifi has proven by a preponderance of the evidence that [d]efendant Township of Parsippany-Troy Hills engaged in retaliation against [p]laintiff because of his protected activities . . . ?" Specifically, the jury asked, "Who/what does defendant, Township of Parsippany-Troy Hills include?"[14]

---

[14] After first reading the jury's question to herself, the judge told counsel, "I knew this was going to be a question. I'm not surprised at the question. I don't think you will be either, gentlemen."

A-2356-17T1

Plaintiff's counsel argued that the judge should respond that the Township includes the "upper-level people at the [PD]." The judge responded that in this particular form of government, the Township can act through the mayor. Plaintiff's counsel replied that, in this context, the actions occurred within the PD, and, therefore, the Township included "the people in charge" of the PD. Defense counsel argued that plaintiff was trying to impose vicarious liability on the Township for the actions of its employees, which he asserted was "contrary to case law" since this was "not a negligence case."

Despite the judge's acknowledgment that she anticipated that this question was going to come up, the judge ruled that she "was not going to determine vicarious liability in this case." She then provided the jury with the following limited response:

> There are two defendants in this case, former-Chief Michael Peckerman, personally, and the Township of Parsippany-Troy Hills, which is the municipality of Parsippany-Troy Hills. Okay. That's the answer to your question.

In a post-trial certification, plaintiff's counsel claimed "the [j]ury seemed confused" by the judge's response.

16

A short time later, the jury returned its verdict.[15]  The jury first returned a 6-0 verdict finding that plaintiff proved by a preponderance of the evidence that he held an objectively reasonable belief that the following activities or practices involved an actual or potential violation or public policy:

- The activities or practices raised in plaintiff's Animal Control memo of September 9, 2009.

- The activities or practices raised in plaintiff's notice of tort claim.

- The activities or practices raised in plaintiff's school crossing guard memo of July 1, 2011.[16]

The jury next returned a 6-0 verdict finding that plaintiff proved by preponderance of the evidence that he disclosed or threatened to disclose to defendants one or more of the activities or practices that involved an actual or potential violation or public policy.

Critical to this appeal, the jury then returned a 6-0 verdict finding that plaintiff failed to prove by a preponderance of the evidence that either the

---

[15]  The judge provided her response to the jury's question in open court at 3:55 p.m.  Shortly thereafter, the jurors informed the judge that they had reached a verdict.

[16]  The jury found that plaintiff's two other reports of suspected unlawful activities – the thirteen missing laptop computers and the request of Officer Kinsey for compensatory time for a day he normally worked, despite being out on family leave – did not involve an actual or potential violation or public policy.

A-2356-17T1

Township or Chief Peckerman engaged in retaliation against plaintiff because of his protected activities, resulting in a no cause verdict. Plaintiff filed a motion for a new trial, which the trial judge denied on December 27, 2017.

This appeal followed.

II.

Elements of a CEPA Claim

CEPA prohibits an employer from taking "retaliatory action" against an employee for protected whistleblower conduct. N.J.S.A. 34:19-3. To establish a prima face case under CEPA, a plaintiff must prove four elements: 1) the plaintiff reasonably believed that the employer's conduct violated "either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy"; 2) the plaintiff "performed a 'whistle-blowing' activity"; 3) the plaintiff experienced an adverse employment action; and 4) "a causal connection exists between the whistle-blowing activity and the adverse employment action." Yurick v. State, 184 N.J. 70, 78 (2005) (citation and internal quotation marks omitted).

CEPA prohibits an employer from taking any retaliatory action against an employee because the employee does any of the following:

> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the

employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation . . . ;

. . . .

or

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ;

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation . . . ; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

[N.J.S.A. 34:19-3.]

"Retaliatory action" is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e).

19

> What constitutes an "adverse employment action" must be viewed in light of the broad remedial purpose of CEPA, and our charge to liberally construe the statute to deter workplace reprisals against an employee speaking out against a company's illicit or unethical activities. Cast in that light, an "adverse employment action" is taken against an employee engaged in protected activity when an employer targets him for reprisals [.]
>
> [Donelson v. DuPont Chambers Works, 206 N.J. 243, 257-58 (2011).]

In addition to facts supporting whistleblower conduct, an employee who claims retaliation under N.J.S.A. 34:19-3 must demonstrate "a causal connection exists between the whistle-blowing activity and the adverse employment action." Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003). The causal connection "can be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action." Maimone v. Atl. City, 188 N.J. 221, 237 (2006).

"CEPA is a remedial statute that 'promotes a strong public policy of the State' and 'therefore should be construed liberally to effectuate its important social goal.'" Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 555 (2013) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). That social goal is "to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector

20

employers from engaging in such conduct.'" Dzwonar, 177 N.J. at 461 (quoting Abbamont, 138 N.J. at 431). Thus, CEPA "shields an employee who objects to, or reports, employer conduct that the employee reasonably believes to contravene the legal and ethical standards that govern the employer's activities." Hitesman v. Bridgeway, Inc., 218 N.J. 8, 27 (2014).

A CEPA plaintiff need not show that the employer actually violated the law, only that the plaintiff reasonably believed that the employer was violating a law or a clear mandate of public policy. Dzwonar, 177 N.J. at 462. CEPA is not intended to "make lawyers out of conscientious employees." FOP v. City of Camden, 842 F.3d 231, 240 (3d Cir. 2016).

Vicarious Liability Under CEPA

CEPA defines "employer" as "any individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent[.]" N.J.S.A. 34:19-2(a). A "supervisor" is "any individual with an employer's organization who has the authority to direct and control the work performance of the affected employee, who has authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains[.]" N.J.S.A. 34:19-2(d).

In Higgins v. Pascack Valley Hospital, 158 N.J. 404 (2000), our Supreme Court examined the issue of whether CEPA "imposes liability on an employer for retaliating against a complaining employee when the employer was not complicit in the conduct of co-employees about which the employee complained." Id. at 409. The Court held that illegal activity of co-employees falls within subsection N.J.S.A. 34:19-3(c), which does not contain a requirement the conduct be "by the employer." Id. at 424-25.

In Higgins, the plaintiff complained to her supervisor about two coworkers and alleged that her employer retaliated against her by temporarily transferring her to another location, reducing her work hours, and denying her a promotion. Id. at 408-09. The Court held that CEPA "protects an employee who, with a reasonable basis, complains to his or her employer about the misconduct of co-employees, even in the absence of employer complicity in the misconduct." Id. at 410.

In Abbamont, the plaintiff alleged that his employer, a school board, retaliated against him through its supervisory employees by not rehiring him as a tenured teacher after he had complained about inadequate conditions in the school's metal shop. 138 N.J. at 410. Rejecting the board's argument that it was not vicariously liable for the actions of its school officials, the Court held that

A-2356-17T1

the same "standards governing employer liability" in Law Against Discrimination[17] (LAD) cases shall apply in CEPA cases as well; that is, "to fulfill the remedial purposes of CEPA, employers should be strictly liable for equitable relief in the nature of reinstatement, restoration of back pay and the like." Id. at 417-18. The Court concluded that the plaintiff's evidence established a basis for the board's vicarious liability to plaintiff for compensatory damages under CEPA as a result of the actions of supervisory employees, the board's superintendent and principal. Id. at 425.

Jury Instructions

It is well-established that appropriate and proper jury charges are essential to a fair trial. Washington v. Perez, 219 N.J. 338, 350-51 (2014). Juries are "entitled to an explanation of the applicable legal principles and how they are to be applied in light of the parties' contentions and the evidence produced in the case." Id. at 351 (quoting Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002)). "Without a proper jury charge, a jury will not have a proper road map to guide them in their deliberations." Piech v. Layendecker, 456 N.J. Super. 367, 376 (App. Div. 2018) (citing Das v. Thani, 171 N.J. 518, 527 (2002)). The trial judge has an "independent duty . . . to ensure that the jurors receive accurate

---

[17] N.J.S.A. 10:5-1 to -49.

instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party." State v. Reddish, 181 N.J. 553, 613 (2004) (quoting State v. Thompson, 59 N.J. 396, 411 (1971)).

"Appellate review of a challenged jury instruction entails not only scrutiny of the charge itself, but an inquiry as to whether an erroneous charge may have affected the trial's result." Washington, 219 N.J. at 351. Additionally, the reviewing court must "examine the charge as a whole, rather than focus on individual errors in isolation." Ibid. (quoting Viscik, 173 N.J. at 18). Generally, we will not reverse "if an erroneous jury instruction was incapable of producing an unjust result or prejudicing substantial rights." Ibid. (quoting Mandal v. Port Auth. of N.Y. & N.J., 430 N.J. Super. 287, 296 (App. Div. 2013)). However, "erroneous instructions on material points are presumed to be reversible error." Ibid. (quoting McClelland v. Tucker, 273 N.J. Super. 410, 417 (App. Div. 1994)).

During civil trials, the court "should give an instruction that appropriately guides the jury on the legal basis of a plaintiff's claim or a defendant's affirmative defense, so long as there is a reasonable factual basis in the evidence to support that claim or defense." Walker v. Costco Wholesale Warehouse, 445

N.J. Super. 111, 120 (App. Div. 2016). "Jury charges 'must outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them . . . .'" Velazquez ex rel. Velazquez v. Portadin, 163 N.J. 677, 688 (2000) (quoting Jurman v. Samuel Braen, Inc., 47 N.J. 586, 591-92 (1996)).

III.

On appeal, plaintiff argues that the trial judge effectively declined to answer the jury's question inquiring "who or what does [the Township] include," resulting in harmful error that warrants a new trial. We agree.

Upon request for clarification from the jury, "the trial judge is obligated to clear the confusion." State v. Conway, 193 N.J. Super. 133, 157 (App. Div. 1984); see also State v. Savage, 172 N.J. 374, 394 (2002). A clear and accurate answer "ordinarily requires explanation beyond rereading the original charge." Pressler & Verniero, Current N.J. Court Rules, comment 7 on R. 1:8-7 (2021); see also Patton v. Amblo, 314 N.J. Super. 1, 9-10 (App. Div. 1998). However, minor inaccuracies in the judge's response will be disregarded unless they "have the capacity to mislead the jury" or are "clearly capable of leading the jury to an

unjust result." Velazquez v. Jiminez, 336 N.J. Super. 10, 39-40 (App. Div. 2000), aff'd, 172 N.J. 240 (2002).

"An appropriate judicial response requires the judge to read the question with care to determine precisely what help is needed." State v. Parsons, 270 N.J. Super. 213, 221 (App. Div. 1994). From the trial judge's comments to counsel, she not only precisely determined what help was needed, she anticipated it. Notwithstanding her acknowledgment that she "knew this was going to be a question," the judge then inexplicably declined to provide the help that was clearly needed when she failed to inform the jurors as to "who/what does defendant, Township of Parsippany-Troy Hills include?" Rather than answer the question informatively, the judge did nothing to clear the confusion reflected in the jury's question; instead, by simply telling the jury, "There are two defendants in this case," and then naming them, the judge's response likely added to the jury's confusion.[18]

We are convinced the judge's response had capacity to mislead the jury and was clearly capable of leading the jury to an unjust result. Based upon our

---

[18] An appropriate response would have informed the jury that, in this case, the Township includes the supervisory employees within the Parsippany Police Department; from the trial testimony, the supervisory employees would include the police chief, the deputy chief, and the four captains underneath them.

A-2356-17T1

review of the trial record, if properly instructed, a reasonable jury could have found that upper-level supervisory personnel within the PD retaliated against defendant for engaging in protected whistleblower activities. Notwithstanding the jury's finding that plaintiff did not prove that Chief Peckerman engaged in retaliatory conduct, plaintiff presented substantial evidence that would support a determination that other supervisory employees in the PD – the deputy chief and one or more captains – engaged in retaliatory action against plaintiff, including subjecting him to stressful IA probes that lacked merit, with resulting embarrassment, inconvenience, and loss of income.

In addition, we note that charges against Captain Jasiecki were sustained for engaging in wrongful conduct which targeted plaintiff, at a time when plaintiff was assigned to his command; in addition, this occurred after Captain Jasiecki had lodged charges against plaintiff in an IA complaint, which were investigated and not sustained. Plaintiff also presented evidence that then-Deputy Chief Philipps, who later became chief, deliberately failed to schedule a deputy chief test in 2012, notwithstanding plaintiff's specific request. Rather than deny the request, then-Capt. Philipps told plaintiff he never saw the request. Plaintiff presented compelling evidence that this response was clearly incorrect and constituted either a careless misstatement or a deliberate lie. Moreover, we

A-2356-17T1

are satisfied that all the alleged retaliatory actions were within the scope of the authority of the PD's upper-level supervisors.

From our review of the entire trial record, we are satisfied the judge's inadequate response to the jury's question had the capacity to mislead the jury and was clearly capable of leading the jury to an unjust result. Since the jury only asked clarification as to the Township, we see no reason to disturb the verdict in favor of former Chief Peckerman.

In light of our determination that the trial judge's failure to properly respond to the jury's question entitles plaintiff to a new trial against the Township, we decline to address plaintiff's remaining arguments. Even if we determined – which we do not – that the trial court committed error in any of its other pretrial or trial rulings, we discern no basis to find that any such errors constituted harmful error. R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result[.]").

 A-2356-17T1

Affirmed, in part, and vacated, in part, and remanded for a new trial.[19] We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[19] We affirm the dismissal of plaintiff's claims against Chief Peckerman and vacate the dismissal of plaintiff's CEPA claim against the Township and remand for a new trial.

A-2356-17T1