**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4007-18

THOMASENIA L. FOWLER, as
Administrator and Administrator
ad Prosequendum of the Estate
of Willis Edenfield,

     Plaintiff-Respondent,

v.

AKZO NOBEL CHEMICALS, INC.
as successor to Imperial Chemical
Industries PLC, and National Starch
and Chemical Co. (Discovery Only),
CORN PRODUCTS INTERNATIONAL,
INC., as successor to National Starch
and Chemical Co. (Discovery Only),
HENKEL CORPORATION,
individually and as successor-in-interest
to the Adhesive and Electronics Division
of National Standard Chemical Co.
(Discovery Only), and NATIONAL
STARCH, LLC, individually and
as successor to National Starch and
Chemical Co. (Discovery Only),

     Defendants-Respondents,

and

UNION CARBIDE CORPORATION,

    Defendant-Appellant,

_____

Argued March 17, 2021 – Decided May 26, 2021

Before Judges Fuentes, Whipple and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-4820-11.

Michael A. Scodro, (Mayer Brown, LLP) of the Illinois bar, admitted pro hac vice, argued the cause for appellant (Caruso Smith Picini, PC, Michael A. Scodro, Craig Woods (Mayer Brown, LLP) of the Illinois bar, admitted pro hac vice, and Brett E. Legner (Mayer Brown, LLP) of the Illinois bar, admitted pro hac vice, attorneys; Richard D. Picini, Michael A. Scodro, Craig Woods and Brett E. Legner, on the of counsel and on the briefs).

Amber Long argued the cause for respondent (Levy Konigsberg, LLP, attorneys; Amber Long and Madeleine Skaller, on the brief).

PER CURIAM

    Defendant Union Carbide Corporation appeals from an April 18, 2019 renewed motion for judgment notwithstanding the verdict, or in the alternative, for a new trial, pursuant to Rules 4:40 and 4:49-1(a) after a jury trial in an asbestos exposure case. Plaintiff, Thomasenia Fowler, is the widow of decedent, Willis Edenfield, who died from mesothelioma. We are constrained

A-4007-18

to reverse for erroneous jury instructions, one regarding defendant's duty to warn, and one regarding medical causation.

On June 27, 2011, plaintiff filed suit as personal representative, administrator, and administrator ad prosequendum of Edenfield's estate, alleging strict liability and negligent failure-to-warn claims against Union Carbide, along with claims against Edenfield's previous employers.  In 2015, the trial court granted summary judgment in favor of Union Carbide and dismissed the complaint with prejudice.

Then, in Fowler v. Akzo Nobel Chemicals, Inc., No. A-2300-15 (App. Div. May 17, 2017) (slip op. at 4-8), we reversed the trial court's entry of summary judgment because the record demonstrated the evidence was sufficient to create a genuine issue of material fact as to whether Edenfield was exposed to Union Carbide's asbestos frequently, regularly, and proximately. The case thereafter proceeded to trial.

I.

We draw the following facts from the trial record.  Edenfield worked at the Bloomfield Plant (the Plant) between 1954 and 1994.  The Plant was operated over time by Rubber and Asbestos Corporation from 1954 to 1962, PPG Industries, Inc. from 1962 to 1971, and National Starch and Chemical Co.

A-4007-18

(National Starch) from 1971 to 1995 (the employers). These companies used asbestos in the manufacturing of adhesive products. Edenfield worked in the "mill room" as a batcher, weighing and preparing dry ingredients for manufacturing.

Between 1969 and 1984, Union Carbide delivered approximately 56,000 pounds of Calidria-brand asbestos in the form of a fine, white powder to the Plant. Union Carbide mined its asbestos from a mineral deposit in New Idria, California, that contained short-fiber chrysotile asbestos. It shipped the asbestos in ten- and forty-pound bags, with most shipments in the smaller bags. Usage records at the Plant detailed the daily amount of each type of asbestos used between 1976 and 1985. Specifically, Union Carbide's asbestos was regularly used in the manufacturing of adhesive products.

Testimony regarding Edenfield's work history came from his co-worker, Rodney Dover, who worked with Edenfield for twenty-six years. According to Dover, Edenfield's job was to weigh and measure dry ingredients, including raw asbestos, and place them in bags for use in the Plant's manufacturing process. Dover testified that the "batching area" of the mill room was a twenty-foot by twenty-foot space. Dover and other batchers typically used larger bags of ingredients, some of which weighed approximately 150 or 200

A-4007-18

pounds. Edenfield was the only batcher who worked with bags of ingredients between ten and forty pounds.

All batchers worked during the same day shift and prepared all ingredients during that shift. After weighing and preparing all the dry, raw ingredients, the batchers took them to either the mill room or the "churn room," located in another building. In the churn room, workers made epoxy resins in churns or vats, using Calidria asbestos as a thickening agent. In contrast, the mill room did not contain vats or tanks, but allowed workers to mix chemicals using rollers.

Dover explained both the process that Edenfield and other batchers followed to obtain the dry, raw ingredients they used and where they took them. Most ingredients were obtained from the onsite warehouse and brought to the mill room. The ingredients stored in the warehouse were kept on pallets, and batchers would move them using a forklift, but they carried the smaller bags by hand. Edenfield was not involved in the process of moving materials with the forklift. Workers in both the churn and mill rooms worked twenty to thirty feet away from each other. Dover testified that the air "was basically clear" in the mill room because the Plant contained exhaust fans, which would evacuate the dust and other airborne materials to the outside environment.

5

Even so, Dover sometimes saw dust in the air. The batchers also swept up powder spills at the end of each day.

He also did not recall the company names of any particular asbestos suppliers at the Plant other than Johns Manville, which delivered its asbestos in 150- or 200-pound bags and was likely handled by batchers other than Edenfield. Different from Union Carbide, Johns Manville mined its chrysotile asbestos from the Jeffrey Mine in Canada and, according to one of Union Carbide's experts, the asbestos from the Jeffrey Mine was contaminated with tremolite.

At trial, William Dyson, Ph.D., testified on behalf of Union Carbide as an expert in the fields of industrial hygiene, exposure assessments, risk assessments, and Occupational Safety and Health Act[1] (OSHA) requirements. Dyson testified the Plant employees used Calidria in the processes in the churn room and "paper coating" room, neither of which was the area where Edenfield worked. Dyson estimated that between seventy-five and ninety percent of the asbestos used at the Plant was supplied by companies other than Union Carbide. Dyson further opined there was no evidence that Edenfield either

---

[1] Occupational Safety and Health Act, 29 U.S.C. §§ 651 to 678. The term OSHA refers to both the statutory compilation and the Occupational Safety and Health Administration.

worked with, or was exposed to, Calidria asbestos. He came to this conclusion because none of Edenfield's co-workers testified that the Plant used Calidria asbestos, nor had they observed Edenfield using Calidria asbestos, and the Plant used Calidria asbestos only in the churn room, which was located in a separate building from the one where Edenfield worked.

The record reveals a timeline of actions Union Carbide took to address the safety of its products. In 1968, Union Carbide began placing a warning on the bags of Calidria asbestos that it sold, which stated: "WARNING: BREATHING DUST MAY BE HARMFUL. DO NOT BREATHE DUST." Then, in 1972, Union Carbide changed the warning to the following in order to comply with OSHA requirements: "CAUTION. Contains Asbestos Fibers. Avoid Creating Dust. Breathing Asbestos Dust May Cause Serious Bodily Harm."

Union Carbide took other steps to warn customers of the dangers of asbestos, as well. In 1975, it sent Calidria customers a Material Safety Data Sheet (MSDS) outlining the chemical properties of its asbestos and safety information. In 1977, it sent customers an updated MSDS, along with several pamphlets pertaining to asbestos safety, and encouraged employers to transmit the information to employees. Both MSDSs recommended that employees

7

working with Calidria asbestos wear protective clothing, avoid inhalation of dust, provide local exhaust for every operation, remove spilled material by vacuum or water, carefully launder personal clothing to avoid airborne exposure to asbestos, and undergo an annual comprehensive medical examination, among other measures. The pamphlets also recommended numerous precautions such as wearing respirators, and warned that exposure to asbestos fibers could increase the risks of developing mesothelioma, asbestosis, lung cancer, and cancer of the digestive tract.

In 1981, Union Carbide sent its customers information from the Asbestos Information Association/North America, regarding best practices for handling asbestos and possible health implications, along with OSHA regulations. Union Carbide also sent employers OSHA-recommended posters that instructed employees to use respirators, vacuum-clean spills, leave dusty clothes at their places of employment, repair broken bags, and report unsafe conditions to their employers. It is unclear from the record when Union Carbide sent the posters to Edenfield's workplace.

At the same time, beginning no later than 1972, Union Carbide offered to perform air monitoring testing for asbestos dust to its customers or, if they preferred, to offer training and equipment in order to perform the testing

8

themselves. The record contains a January 19, 1972 letter from a Union Carbide manager to a National Starch employee, memorializing their conversation about asbestos testing and enclosing information on how to perform it.

Further, Union Carbide representatives spoke with Edenfield's employers—who owned the Plant—to discuss safety measures and dangers associated with Calidria. In August and September 1971, its representatives met and spoke via telephone with Edenfield's employer to discuss safe operating procedures for Calidria, toxicity problems, potential health hazards, threshold limit values, and existing legislation pertaining to asbestos.

Doctors from Union Carbide's Industrial Medicine and Toxicology Department authored asbestos toxicology reports from 1964 to 1969, outlining the known risks of asbestos and recommended health and safety measures, including threshold limit values. One 1969 toxicology report warned that exposure to asbestos dust could lead to mesothelioma and that individuals who were even slightly exposed could develop it as much as forty years later. The report recommended that customers who used its asbestos-containing products take safety measures, such as installing "closed flow systems" and exhaust

A-4007-18

ventilation, wearing respirators, and conducting environmental monitoring to ensure that work areas did not exceed threshold limit values.

However, the 1969 toxicology report excised a portion that Dr. C.U. Dernehl (one of the doctors from Union Carbide's Industrial Medicine and Toxicology Department) wrote, in which he stated that he was not convinced that the proposed new threshold limit values would prevent employees from developing mesothelioma. While Sarah Opperman, Union Carbide's corporate representative, testified that Union Carbide sent these toxicology reports to customers, it is not clear that the company sent the reports to Edenfield's employers because they were not in the Plant's files.

In March 1972, OSHA held a hearing to solicit views and arguments regarding its proposed warnings for asbestos labels. The National Institute for Occupational Safety and Health (NIOSH) recommended a warning that stated: "HARMFUL: May Cause Delayed Lung Injury (Asbestosis, Lung Cancer). DO NOT BREATHE DUST. Use only with adequate ventilation and approved respiratory protective devices." Union Carbide was aware of the NIOSH-recommended warning and submitted a comment at the OSHA hearing. While the record does not contain Union Carbide's comment, it reflects that Union Carbide did not utilize the NIOSH-recommended warning on its Calidria bags.

10

A-4007-18

Similarly, in March 1972, the Manufacturing Chemists' Association's Labels and Precautionary Committee submitted a comment to OSHA to propose a warning that stated: "WARNING: HARMFUL IF INHALED. MAY CAUSE DELAYED LUNG INJURY (ASBESTOSIS, LUNG CANCER). Do not breathe dust. Use only with adequate local exhaust ventilation or approved respiratory protective devices. . . ." Dernehl was a member of this committee. Again, the record reflects that Union Carbide did not use this warning.

Further, on June 22, 1972, a Union Carbide sales manager circulated a memorandum to instruct six salespeople on how to discuss recently enacted OSHA regulations with customers. He wrote that salespeople should "[c]ontrol . . . the conversation" and "[a]ssure the customer that the new law is reasonable." He encouraged salespeople to be aggressive and "keep the customer on the defensive," if the customer threatened to stop purchasing asbestos. This manager spoke with National Starch about the regulations in 1972.

In 1983, Union Carbide employee, R.W. Rebholz, wrote an internal memorandum stating that "[i]t is widely recognized" that the 1972 label on the Calidria bags "understates the risk associated with exposure to asbestos dust."

A-4007-18

He attached a proposed alternative warning, which cautioned that breathing asbestos dust was a cancer hazard and instructed users to wear an OSHA-approved respirator. Union Carbide rejected the option to use both labels on the basis that they "would be confusing to the individual using the product."[2] OSHA informed Union Carbide that it could use the alternative label if it submitted a formal request and OSHA approved the label. Opperman was not aware of whether it submitted a request, though nothing in the record demonstrates that Union Carbide ever used the alternative label.

The record also contains some evidence of steps Edenfield's employers took to protect the Plant workers from the hazards of asbestos. Dover testified that he requested respirators to wear on the job, which the employer provided.[3] He said that Edenfield "occasionally" wore a respirator. At some point during Dover's tenure, his employer installed ventilation fans in the Plant. And between at least 1976 and 1982, National Starch performed air testing for asbestos to ensure that levels did not exceed OSHA limits.

Dover, however, testified that he did not change his clothes when he arrived at the Plant or left; instead, his employer provided clothing to wear

---

[2] The record does not establish who at Union Carbide rejected the option to use two warning labels.

[3] Dover did not testify as to when this occurred.

over his own clothes. Additionally, no doctor or nurse employed by the Plant owners ever examined him. Dover also did not recall receiving anything in writing from his employer regarding asbestos, did not observe air monitoring in his area of the Plant, and did not receive supervisory instructions on worker safety.

Relevant to causation, the record contains evidence of factors that may have played a role in Edenfield contracting mesothelioma other than Union Carbide's asbestos, including his exposure to Johns Manville's asbestos and to asbestos used in other processes at the Plant. Edenfield's answers to Union Carbide's interrogatories stated that he worked around other employees who handled asbestos and asbestos-containing products, including loose asbestos, asbestos fibers, valves, gaskets, boilers and furnaces, and that the work created a lot of dust, which he breathed in.

Dr. James D. Crapo also testified on behalf of Union Carbide. The court qualified him as an expert in the fields of pulmonary and internal medicine related to chrysotile, including Union Carbide's asbestos and its correlation with asbestos-related diseases. He opined that if the information in plaintiff's interrogatories was accurate, the resulting exposure to asbestos would constitute a substantial contributing factor in Edenfield's development of

mesothelioma. However, Crapo also opined that Edenfield's exposure to Union Carbide's asbestos, as described by Dover, did not create a risk for him to develop mesothelioma because Union Carbide's asbestos did not contain the fiber structure that could reach the lower lung and contribute to causation of the disease.

Last, Dr. Victor Roggli testified on behalf of Union Carbide. The court qualified him as an expert in pathology and the diagnosis and causation of asbestos-related diseases, including mesothelioma. He opined that it was highly unlikely that Edenfield's mesothelioma was caused by Union Carbide's asbestos because Union Carbide's asbestos was not contaminated with tremolite, as was Johns Manville's asbestos.

On January 22, 2019, the jury returned a verdict in plaintiff's favor on claims of strict liability and negligent failure to warn and awarded $2,380,000 in damages. On February 11, 2019, the court entered judgment in favor of plaintiff and against Union Carbide. Union Carbide filed a motion for judgment notwithstanding the verdict or for a new trial, which the court denied on April 19, 2019. This appeal followed.

Having reviewed the record and each of Union Carbide's arguments, we conclude Union Carbide is entitled to a new trial because of improper jury instructions regarding Union Carbide's duty to warn and proximate cause.

## II.

First, Union Carbide argues that the court gave an improper instruction on the duty to warn. It argues the instruction was erroneous because the court limited the jury to considering the warnings on its asbestos bags, and not the warnings and information it sent to Edenfield's employers, and that a proper instruction might have changed the jury's verdict.

During the charge conference, Union Carbide asked the court to instruct the jury to consider whether it acted reasonably in both the warnings it placed on the bags and the information it communicated to Edenfield's employers, including instructions, warnings, and offers to assist with worker safety. It proposed the following instruction:

> [F]or purposes of deciding whether the warning given was adequate, you may consider as part of the warning the cautionary information given to an employer with the intention or purpose that the employer alert employees to the dangers of the product and the proper methods of mitigating the risks presented by the product.

A-4007-18

The court ruled that Union Carbide owed separate duties to its customers and their employees, which were not interdependent. The court found that Union Carbide maintained its duty to the "end user"—either Edenfield or his co-workers who opened the bags in his presence—such that the warnings it issued to the employer did not discharge its duty to warn Edenfield.

At trial, the court issued the following instruction for Union Carbide's duty to warn:

> In the employment context, a manufacturer or supplier of products that are used by employees is required to take reasonable steps to ensure that its warning reaches those employees. Satisfying that obligation may require that warnings be communicated to employers as well as employees.
>
> In this case there has been evidence of warnings provided both on labels on Union Carbide's asbestos as well as warnings and information provided to Mr. Edenfield's employers. In determining whether Union Carbide satisfied its duty to warn, you may consider both of these avenues of warning.
>
> The duty to put an adequate warning on the product may not be discharged by warnings and information to the employer.

But contrary to this instruction, question 3A on the verdict sheet instructed jurors to consider whether plaintiff proved that "Union Carbide failed to provide an adequate warning or instructions on its product rendering

16

it not reasonably safe for its intended and foreseeable use." During deliberations, the jury made the following inquiry: "[o]n Question 3A is adequate warning/instructions only to the labels on the asbestos bags or does it include other materials, that is to say [MSDS] and pamphlets[?]" Union Carbide argued that "the question should speak for itself" and that the court should only refer the jury to the charges, if anything. The court responded to the jury that Question 3A "deals with the asbestos bags."

The jury answered "yes" to Question 3A. It answered "no" to Question 3B, which asked whether plaintiff proved "by a preponderance of the credible evidence that . . . Union Carbide failed to take reasonable steps to ensure that its warnings reached . . . Edenfield." It also answered "yes" to Question 4, which asked whether plaintiff proved that "Union Carbide's failure to provide an adequate warning or instructions with respect to its product or failure to take reasonable steps to ensure that its warnings reached . . . Edenfield was a proximate cause of . . . Edenfield's exposure to Union Carbide's asbestos."

"It is fundamental that '[a]ppropriate and proper charges to a jury are essential for a fair trial.'" Prioleau v. Kentucky Fried Chicken, 223 N.J. 245, 256 (2015) (quoting Velazquez ex rel. Velazquez v. Portadin, 163 N.J. 677, 688 (2000)). The jury charge should outline the issues, set forth the law in

17

clear and understandable terms, and plainly explain how the jury should apply legal principles to the facts it finds. Id. at 256-57.

We review not only the jury charge itself, but whether errors in the charge may have affected the outcome of the trial. Washington v. Perez, 219 N.J. 338, 351 (2014). We "must examine the charge as a whole, rather than focus on individual errors in isolation." Ibid. (quoting Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002)). Generally, we will not "reverse if an erroneous jury instruction was 'incapable of producing an unjust result or prejudicing substantial rights.'" Ibid. (quoting Mandal v. Port Auth. of N.Y. & N.J., 430 N.J. Super. 287, 296 (App. Div. 2013)).

A strict liability claim in a products liability, failure-to-warn case requires the plaintiff to prove "that (1) without warnings or adequate warnings, the product was dangerous to the foreseeable user and therefore defective; (2) the product left the defendant's control in a defective condition (without warnings or adequate warnings); and (3) the lack of warnings or adequate warnings proximately caused an injury to a foreseeable user." Whelan v. Armstrong Int'l, Inc., 242 N.J. 311, 333 (2020) (alteration in original) (quoting Zaza v. Marquess & Nell, 144 N.J. 34, 49 (1996)). But ultimately, the question is whether the manufacturer acted in a reasonably prudent manner

when it introduced the product into the marketplace, which it would prove by showing it acted reasonably prudently in the warnings it provided, and in marketing the product. Id. at 331-32 (quoting Zaza, 144 N.J. at 49).

In an asbestos failure-to-warn case, the plaintiff must also prove two types of causation: "product-defect causation and medical causation." Id. at 333 (citing James v. Bessemer Processing Co., 155 N.J. 279, 295-96 (1998)). And second, "[f]or product-defect causation, the plaintiff must show that the defect in the product—the lack of warnings or adequate warnings—was a proximate cause of the asbestos-related injury." Id. at 337 (citing Coffman v. Keene Corp., 133 N.J. 581, 594 (1993)).

However, a manufacturer cannot delegate to the employer its duty to warn the user of the dangers of its product. Grier v. Cochran Western Corp., 308 N.J. Super. 308, 319 n.3 (App. Div. 1998) (citing Coffman, 133 N.J. at 608). At the same time, our Supreme Court has explained how a manufacturer can satisfy its duty by communicating the warning to the employer. In short, a "heeding" presumption means "if an adequate warning exists, a product is no longer considered defective, because when a manufacturer provides a warning, 'the seller may reasonably assume that it will be read and heeded.'" Coffman, 133 N.J. at 596 (quoting Coffman v. Keene Corp., 257 N.J. Super. 279, 287

19

(1992)); see Theer v. Philip Carey Co., 133 N.J. 610, 618-24 (1993).  As such, "if a seller or manufacturer is entitled to a presumption that an adequate warning will be read and heeded, plaintiff should be entitled to the same presumption when no warning is given."  Coffman, 133 N.J. at 596.

In Coffman, the Supreme Court stated that "in the employment setting, the adequacy of a warning with respect to unsafe products may require that they be communicated to employers as well as employees; the adequacy of a warning entails alerting the employer in order to alert the employee of the dangers of the unsafe product."  Coffman, 133 N.J. at 607 (emphasis added). The Court further explained that in the modern workplace manufacturers typically rely on supervisors and managers to transmit warnings to employees, and manufacturers ensure the supervisors adequately warn employees, so they can fulfill their duty to provide a safe workplace.  Ibid.  But the Court did not specify the circumstances under which a manufacturer's reliance on an employer constitutes an adequate warning to the employee, and it noted the manufacturer maintains a concurrent duty to provide adequate warnings regarding unsafe products to both employers and employees.  Id. at 609 (analyzing application of the heeding presumption in an asbestos failure-to-warn case).

Then, in <u>Theer</u>, the Court discussed the heeding presumption in an asbestos failure-to-warn case and explained that the asbestos-producing defendants were required to overcome the employer heeding presumption, which presumes the employer would have heeded an appropriate warning from the defendants and communicated it to employees to allow them to take precautions that minimized injury risks. <u>Theer</u>, 133 N.J. at 622. They could do so through sufficient evidence pertaining to:

> [T]he adequacy of the warnings that were given, whether they were directed to employers, whether they were calculated to reach and inform employees who would foreseeably be exposed to those products in the workplace, and whether the employer would have required or allowed employees to take precautionary measures to overcome the risks of exposure to asbestos.
>
> [<u>Ibid.</u>]

<u>Grier</u> also addressed manufacturer-placed warnings after a jury verdict. 308 N.J. Super. at 312-14. There, the plaintiff, an airline employee, was injured by a beltloader vehicle the defendant manufactured. On appeal, this court held a machine manufacturer had a duty "to take reasonable steps to ensure that appropriate warnings for safe use reach foreseeable users of the equipment. What is reasonable depends on the circumstances of a given case.

21

Questions of reasonableness in determining the adequacy of warnings are ordinarily for the jury to resolve." Id. at 317.

We explained:

> There is no general rule as to whether one supplying a product for the use of others through an intermediary has a duty to warn the ultimate product user directly or may rely on the intermediary to relay warnings. The standard is one of reasonableness in the circumstances. Among the factors to be considered are the gravity of the risks posed by the product, the likelihood that the intermediary will convey the information to the ultimate user, and the feasibility and effectiveness of giving a warning directly to the user.
>
> [Id. at 318 (quoting Restatement (Third) of Torts: Products Liability § 2 cmt. i (Proposed Final Draft, April 1997)).]

Also in Grier, we referred to Coffman's holding that manufacturers often instruct employers to alert employees of an unsafe product's dangers, who then rely on supervisors and managers to transmit warnings to employees, ibid. (quoting Coffman, 133 N.J. at 607), and that the plaintiff was "incorrect in his contention that, as a matter of law, a manufacturer may not discharge its duty to warn by alerting the employer of the dangers in the operation of sophisticated machinery." Ibid. Rather, "[t]he question simply is whether, in

the context of a given case, the manufacturer acted reasonably in conveying adequate information on the safe use of its product." Ibid.

Thus, in Grier we explained the concept of "adequate product warning" under the applicable section of the New Jersey Product Liability Act (PLA)[4] "does not require that warnings be put in a particular place or transmitted by a particular means." Id. at 317 (citing Repola v. Mobark Indust., Inc., 934 F.2d 483, 491 (3d Cir. 1991)). The concept is a flexible one that depends on the product's characteristics, the intended user, and the circumstances of its use. Ibid. As such, a manufacturer may be expected to take different steps to ensure safety when the intended user is an individual consumer as opposed to employees in an industrial environment, or where the product is sophisticated machinery, which may require employee training. Id. at 317-18.

---

[4] Under the PLA:

> An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used . . . .
>
> [N.J.S.A. 2A:58C-4.]

23

Similar to the steps taken by Union Carbide here, in Grier, the first page of the defendant's operations manual contained a warning about the product, the beltloader's guardrail contained an additional warning, and the defendant offered free training to all airlines that purchased its beltloader. Id. at 318-19. The court declined to overturn the jury's verdict because there was sufficient evidence to conclude that the defendant acted reasonably in taking steps to ensure that the warnings reached the product user. Id. at 320-21.

As these cases illustrate, the manufacturer may not delegate to the employer its duty to warn the employee of the unsafe product, but instead it maintains a separate, concurrent duty to warn both the employee and employer. However, in appropriate circumstances, the manufacturer may discharge this duty, in the eyes of the jury, by conveying the warnings to the employer and relying on the employer to convey them to the employee.

Here, the court correctly ruled that Union Carbide owed separate duties to Edenfield and his employers, and that Union Carbide's warnings to his employers did not discharge its duty to Edenfield. The court's instructions appropriately explained the two separate duties, noted that the manufacturer must take reasonable steps to ensure the warnings reach the employee, and balanced Union Carbide's retention of the duty to Edenfield with the fact that it

24

could communicate warnings to the employer. The judge also properly instructed that the jury could consider both "avenues of warning." However, the court's error was in the final sentence of its instructions on Union Carbide's duty to warn Edenfield, in which it instructed the jury that Union Carbide's duty to place an adequate warning on the product could not be discharged through warnings and information to the employer.

This instruction is inconsistent with the case law, which allows the manufacturer to discharge the duty by providing adequate warnings and information to the employer, so long as the manufacturer's actions in intending the warnings to reach the employer were reasonable under the circumstances. Grier, 308 N.J. Super. at 317. The jury would be obligated to consider the nature of the product, the nature of the safety training the product required, the nature of the training Union Carbide offered, whether it was reasonable for Union Carbide to believe that Edenfield's employer would relay the warnings to him, and whether they were sufficiently calculated to reach him. Theer, 133 N.J. at 622. It would also need to consider the nature of the workplace, including whether Union Carbide had the ability to enter the Plant and speak directly to employees, hand them pamphlets, and display posters. Ibid.

25

The adequacy of warnings to the employee are part of the balancing test in determining reasonableness under the circumstances. If the warnings and instructions on the product are inadequate, the manufacturer must make greater efforts to warn the employer of the product's dangers, provide sufficient information to the employer on the product's dangers and safe use, and ensure that the employer conveys this information to the employee. However, the manufacturer may also have to establish that the nature of the workplace prevented the manufacturer from conveying the information directly to the employee. At bottom, the issue of reasonableness is for the jury to decide.

The court essentially compounded its error in the verdict sheet with its response to the jury's question. Question 3A of the verdict sheet improperly confined the jury to consider the warnings or instructions Union Carbide provided on the product, without considering those that it provided to Edenfield's employers. And when the jury asked whether it could consider that information, the court erroneously limited it to considering the warnings on the asbestos bags vis-à-vis the wording of Question 3A.

In sum, the court therefore issued an erroneous jury instruction on Union Carbide's duty to warn Edenfield, which is a material consideration, rendering the instruction presumptively reversible. Further, the record reflects that the

26

error might have affected the trial's outcome. For example, the jury found Union Carbide failed to provide adequate warnings on the asbestos bags. Similarly, Union Carbide did not attempt to delegate to Edenfield's employer its duty to warn, but it did attempt to discharge this duty by providing information for them to pass onto Edenfield. Union Carbide introduced evidence of warnings and information that it communicated to the employers, including the MSDS, pamphlets and posters.

The documents Union Carbide distributed to Edenfield's employer outlined risks associated with asbestos as well as numerous safety measures and recommended precautions. Union Carbide also offered to perform air testing for asbestos dust for Edenfield's employers, to conduct training of employees, and to provide equipment in order for the employers to perform their own testing. It also met with the employers to discuss safety measures and dangers associated with its asbestos, including safe operating procedures, potential health hazards, and threshold limit values.

Perhaps most importantly, in answering "no" to Question 3B, the jury found that plaintiff did not prove by a preponderance of the credible evidence that Union Carbide failed to take reasonable steps to ensure that its warnings reached Edenfield – the question they should have been asked. It is possible

27

that if the jury were instructed properly, it would have found that Union Carbide acted reasonably under the circumstances in communicating adequate warnings to Edenfield through his employer.

III.

We also write to address a second jury charge, the need to find medical proximate causation between Union Carbide's activities and Edenfield's mesothelioma. On appeal, Union Carbide also asserts plaintiff had to establish medical causation to prove both its strict liability and negligent failure-to-warn counts. Union Carbide contends that as part of the test of medical causation, plaintiff had to demonstrate that Edenfield was exposed to its asbestos with sufficient "frequency, regularity and proximity," and that the court erred in declining to include these terms with its jury instructions. It argues that proper jury instructions might have changed the jury's verdict because the record did not establish that Edenfield was exposed to its asbestos on a regular basis.

At the charge conference, Union Carbide proposed the following instruction on medical causation:

> [I]n order to prove medical causation, the [p]laintiff must prove that Mr. Edenfield was exposed to [Union Carbide's] product with sufficient frequency, with a regularity of contact, and with the product in close enough proximity to show that the exposure to [Union

Carbide's] product was a substantial contributing factor to Mr. Edenfield's mesothelioma.

The court rejected this instruction. Instead, the court's instruction provided that plaintiff must prove Edenfield's exposure to Union Carbide's asbestos served as a "proximate cause" of his mesothelioma. It clarified that "proximate cause . . . meant that the failure to warn was a substantial factor," such that the asbestos "was an efficient cause of [Edenfield's] injury, that it was not remote or a trivial cause having only an insignificant connection with the harm." The court noted that the jury should not find Union Carbide liable "based on casual or minimal contact with the product . . . [or] on mere guesswork" and cautioned that proximate cause does not require that there are no other independent or contributing causes.

"To prove medical causation, a plaintiff must show 'that the exposure [to each defendant's product] was a substantial factor in causing or exacerbating the disease.'" James, 155 N.J. at 299 (alteration in original) (quoting Sholtis v. Am. Cyanamid Co., 238 N.J. Super. 8, 30-31 (App. Div. 1989)). In James, the court explained that the plaintiffs in toxic-tort litigation faced unique burdens in proving causation because toxic chemicals often involve decades-long latency periods between exposure and disease symptoms and the plaintiffs were often "exposed to multiple products of multiple defendants over an

29

extended period of time." Id. at 300-01 (citing Sholtis, 238 N.J. Super. at 14-16). We recognize plaintiffs faced a "formidable" burden in attempting to prove that their exposure to any single defendant's product was a substantial factor in causing their illness. Id. at 301.

In Sholtis, 238 N.J. Super. at 28-29, our Supreme Court "adopted a 'frequency, regularity and proximity' test" to establish liability in asbestos-exposure cases involving multiple defendants. As explained in James:

> Under that test, in order to prove that exposure to a specific defendant's product was a substantial factor in causing or exacerbating the plaintiff's disease, the plaintiff is required to prove 'an exposure of sufficient frequency, with a regularity of contact, and with the product in close proximity' to the plaintiff. . . . Since proof of direct contact is almost always lacking . . . courts must rely upon circumstantial proof of sufficiently intense exposure to warrant liability.
>
> [James, 155 N.J. at 301-02 (quoting Sholtis, 238 N.J. Super. at 28-29).]

Even further in Sholtis, we found that the test struck an appropriate balance between the needs of the plaintiffs in proving contact with a particular defendant's product under the difficult circumstances of exposure to multiple products, and those of the defendants in protecting against liability based on guesswork. 238 N.J. Super. at 28-29. The test prevents a plaintiff from relying "on evidence which merely demonstrates that a defendant's asbestos

30

product was present in the workplace or that [they] had 'casual or minimal exposure' to it." Kurak v. A.P. Green Refractories Co., 298 N.J. Super. 304, 314 (App. Div. 1997) (quoting Goss v. Am. Cyanamid Co., 278 N.J. Super. 227, 236 (App. Div. 1994)).  We cautioned that the factfinder should focus on the underlying concept of the test and not allow the phraseology to serve as "catch words."  Sholtis, 238 N.J. Super. at 29.

The trial court here primarily relied on the model charge on proximate cause in its instruction, which directs the jury to find whether Edenfield's exposure to Union Carbide's asbestos "was a cause of" his mesothelioma and whether his exposure to Union Carbide's asbestos:

> [W]as a substantial factor that singly, or in combination with other causes, brought about the [injury] claimed by [plaintiff].  By substantial, it is meant that it was not a remote, trivial or inconsequential cause.  The mere circumstance that there may also be another cause of the [injury] does not mean that there cannot be a finding of proximate cause.  Nor is it necessary for the negligence of [defendant] to be the sole cause of [the injury].  If you find that [Union Carbide's] negligence was a substantial factor in bringing about the [injury], then you should find that [defendant's] negligence was a proximate cause of the [injury].
>
> [Model Jury Charges (Civil), 6.12, "Proximate Cause—Where There is Claim That Concurrent Causes of Harm Were Present" (approved May 1998).]

A-4007-18

However, while case law encourages trial courts to follow the model charges in their entirety, it also instructs them to modify the charges to meet the facts. See Reynolds v. Gonzalez, 172 N.J. 266, 288-89 (2002) (citing Velazquez, 163 N.J. at 688) ("The failure to tailor a jury charge to the given facts of a case constitutes reversible error where a different outcome might have prevailed had the jury been correctly charged."). Here, the court issued the general charges for proximate cause, but did not modify them for an asbestos litigation matter in which plaintiff was exposed to products from multiple manufacturers over an extended period of time, which requires the "frequency, regularity and proximity" instruction. Sholtis, 238 N.J. Super. at 28-29.

We discern no support for the contention that the "frequency, regularity and proximity" test is strictly a summary judgment standard. Under Sholtis, the three "factors should be balanced for a jury to find liability." Id. at 28. Likewise, in Kurak, 298 N.J. Super. at 314-22, the court did not limit the test to only summary judgment determinations.

The Sholtis test requires plaintiff to prove that Edenfield was exposed to Union Carbide's asbestos on numerous occasions, and while he was physically close to the product, the court's instructions required plaintiff to prove only

that Edenfield's exposure was more than minimal and that it had a connection to his injury that was greater than insignificant. The latter standard significantly lowered plaintiff's burden and failed to allow the jury to weigh the three factors that the courts carefully crafted to balance the needs of plaintiffs and defendants in multiple product-exposure asbestos litigation cases.

Although the jury found plaintiff proved that Edenfield was exposed to Union Carbide's asbestos, it is not possible to know whether the jury would have found that he was exposed with the requisite frequency, regularity and proximity because the court did not provide such an instruction. The record contains sufficient evidence for a jury to question whether Edenfield was exposed to Union Carbide's asbestos on a liability-imposing basis.

Defendant's remaining arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Reversed, judgment vacated and remanded for a new trial consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

33